Strafford
No. 94-774

### THE STATE OF NEW HAMPSHIRE

v.

### ZETA CHI FRATERNITY

May 22, 1997

18

*Jeffrey R. Howard*, attorney general (*John C. Kissinger, Jr.*, assistant attorney general, on the brief and orally), for the State.

*Nadeau Professional Offices*, of Portsmouth (*James P. Nadeau* on the brief), and *Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the defendant.

HORTON, J. The defendant, Zeta Chi Fraternity, appeals its convictions and sentence on the charges of selling alcohol to a person under the age of twenty-one, RSA 179:5 (1994) (amended 1996), and prostitution, RSA 645:2, I(e) (1996). The defendant argues that the evidence was not sufficient to support the convictions. The defendant also asserts that the Superior Court (*Mohl*, J.) erred in admitting into evidence the minutes of the defendant's meetings. Finally, the defendant challenges the constitutionality of its sentence for illegal sale of alcohol. We affirm the defendant's convictions but vacate and remand for resentencing.

On February 21, 1994, the defendant, a New Hampshire corporation and fraternity at the University of New Hampshire in Durham, held a "rush" at its fraternity house to attract new members. In order to encourage people to attend the rush, the defendant hired two female strippers to perform at the event. Fraternity brothers encouraged guests to give the strippers dollar bills so that they would continue to perform. The brothers also told guests that the

more money the strippers were given, the more that they would do. One of the members of the fraternity was providing change for larger bills. As part of the performance, the dancers lay on a mattress brought out by members of the fraternity and simulated oral sex on each other. At one point, a guest gave five dollars to one of the strippers who sat on the guest's lap. When a brother moved the dancer along, the guest complained that he had given five dollars. The stripper took the guest to the mattress and pushed his head into her crotch. Two witnesses testified at trial that they saw guests being led to the mattress after they gave money, at which point the guests then performed oral sex on the dancer.

In addition, Andrew Strachan, a nineteen-year-old guest at the fraternity party, testified that at some point during the evening he learned that beer was available from a soda machine. He made his way to an apartment in another part of the fraternity house where the machine was located, waited in line with three or four other people, and purchased three to five cans of beer. Strachan also testified that he noticed someone making change for the machine. The fraternity's secretary testified that the fraternity members voted not to provide alcohol at the rush and that they moved the vending machine that contained beer to a separate apartment in another part of the fraternity house for the rush. He also testified, however, that the fraternity had control over the vending machine and its proceeds and that only fraternity members would have an interest in making change for the machine.

## I. Sufficiency of Evidence

### A. Illegal Sale of Alcohol

The defendant first argues the evidence was insufficient to convict it of selling alcohol to a person under the age of twenty-one. Specifically, the defendant contends that the testimony of the State's sole witness that he bought beer from the vending machine was uncorroborated; that even if the jury could find that beer was purchased from the machine, the State failed to prove that the defendant was responsible for the sale; and that the State failed to prove that the defendant acted recklessly. "When a defendant challenges the legal sufficiency of the evidence, we ask whether any rational trier of fact, viewing the evidence and reasonable inferences therefrom in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Fitanides*, 139 N.H. 425, 428, 655 A.2d 411, 413-14 (1995).

■ By arguing that Strachan's testimony that he purchased beer from a vending machine at the fraternity house is uncorroborated, the defendant is essentially asking this court to weigh the credibility of the witness. *See State v. Champagne*, 125 N.H. 648, 651-52, 484 A.2d 1161, 1163 (1984). "[T]he weight and credence to be given to the evidence at trial is the very essence of a jury's function." *State v. Sands*, 123 N.H. 570, 590, 467 A.2d 202, 214 (1983). When a defendant challenges the uncorroborated testimony of the State's witnesses, the decision to accept or reject the witnesses' testimony is "a matter which must be left to the trier of fact." *Champagne*, 125 N.H. at 652, 484 A.2d at 1163.

■ The defendant next argues that the State failed to prove that the defendant caused alcohol to be sold to Strachan. *See* RSA 179:5. The defendant asserts that because the fraternity voted not to provide beer at the rush and the soda machine was moved from the main area in the fraternity house to a separate apartment at the back of the house, the defendant did not have control over the machine, and, therefore, could not have caused the sale of alcohol from the machine. Essentially, the defendant is arguing that the individuals responsible for making the beer available for sale to Strachan were not acting on behalf of the corporation or within the scope of their authority. We begin by noting that the only defendant in this case is a corporate entity. "A corporation is a jural person, but not a person in fact. It is an artificial creature, acting only through agents . . . ." *State v. Luv Pharmacy, Inc.*, 118 N.H. 398, 404, 388 A.2d 190, 194 (1978). A corporation may be held criminally liable for criminal acts performed on its behalf by agents or employees acting within the scope of their authority or employment. *See State v. Pinardville Athletic Club*, 134 N.H. 462, 465, 594 A.2d 1284, 1286 (1991). The criminal conduct need not have been "performed, authorized, ratified, adopted or tolerated by the corporation['s] directors, officers or other 'high managerial agents'" in order to be chargeable to the corporation. *Com. v. L.A.L. Corp.*, 511 N.E.2d 599, 601 (Mass. 1987) (quotation omitted).

■■ In fact, a corporation can be convicted for actions of its agents even if it expressly instructed the agents not to engage in the criminal conduct. *See State v. Hy Vee Food Stores, Inc.*, 533 N.W.2d 147, 150 (S.D. 1995). The agents, however, must have been acting within the scope of their actual or apparent authority. *See United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004-07 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125 (1973); *see also* 19 C.J.S. *Corporations* § 738 (1990). Actual authority can be either express or implied. *See*

22

*Demetracopoulos v. Strafford Guidance Ctr.*, 130 N.H. 209, 213, 536 A.2d 189, 192 (1987). Express authority exists when the principal explicitly manifests its authorization for the agent to act. *Id.* Implied authority is the "reasonable incident or construction of the terms of express authority or results from acquiescence by the principal in a course of dealing by the agent." *Id.* at 215, 536 A.2d at 193 (quotation and ellipses omitted). Apparent authority, on the other hand, "exists where the principal so conducts [itself] as to cause a third party to reasonably believe that the agent is authorized to act." *Id.* (quotation omitted); *see United States v. Bi-Co. Pavers, Inc.*, 741 F.2d 730, 737 (5th Cir. 1984). It is the rare case in which the corporate leadership explicitly authorizes its agents to engage in criminal conduct. "Of necessity, the proof [of] authority to so act must rest on all the circumstances and conduct in a given situation and the reasonable inferences to be drawn therefrom." *Commonwealth v. Beneficial Finance Co.*, 275 N.E.2d 33, 82-83 (Mass. 1971), *cert. denied*, 407 U.S. 910, 914 (1972).

■ Evidence at trial indicates that the defendant had control over the apartment in which the vending machine was located, even though it had voted to make the apartment separate from the fraternity house. More importantly, however, witnesses testified that the defendant had control over the soda machine; that only the defendant had an interest in the proceeds from the machine; that only fraternity members had keys to the apartment in which the machine was located; that someone was making change for the machine; and that no one would have an interest in making change except a member of the fraternity. We believe that from these facts the jury could reasonably have found that an agent of the defendant sold beer from the vending machine and that this agent was acting on behalf of the corporation and within the scope of his authority. *See Pinardville Athletic Club*, 134 N.H. at 465, 594 A.2d at 1286.

■ The defendant next argues that the evidence was insufficient for the jury to find that the defendant acted recklessly, the *mens rea* charged in the indictment. Because the defendant is a corporation, its mental state depends on the knowledge of its agents. *See United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 738 (W.D. Va. 1974). "[T]he corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly." *Id.; see United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir.), *cert. denied*, 484 U.S. 943 (1987).

A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disre-

gards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation.

RSA 626:2, II(c) (1986).

█ In this case, the jury could reasonably have found that the defendant acted recklessly from the facts that about 150 guests, many of them under the age of twenty-one, were at the rush party that had been widely publicized on campus; that it was the defendant's vending machine; that only fraternity members had keys to the apartment in which the machine was located; that party guests gained access to the machine; that someone was making change; and that a number of people were waiting in line to use the machine.

*B. Prostitution*

The defendant next argues that the evidence was insufficient for the jury to find that the defendant knowingly permitted a place under its control to be used for prostitution. *See* RSA 645:2, I(e). Specifically, the defendant argues that there was no evidence that actual sexual penetration occurred. Although it is not entirely clear from the defendant's brief, it appears that the defendant is arguing that sexual penetration requires physical intrusion. In this case, the indictment charged that a woman engaged in sexual penetration in return for consideration by allowing another to perform cunnilingus upon her. Sexual penetration is defined in RSA 632-A:1, V (Supp. 1995) to include cunnilingus or "[a]ny intrusion, however slight, of any part of the actor's body or any object manipulated by the actor into genital or anal openings of the victim's body."

█ We recently held in *State v. Melcher*, 140 N.H. 823, 678 A.2d 146 (1996), that sexual penetration as defined in RSA 632-A:1, V does not require proof of actual penetration when the act of fellatio is involved. We noted that sexual penetration was defined as the act of fellatio for the purpose of RSA 632-A:1, V and did not require proof of actual penetration in the sense of "passing through or into." *Melcher*, 140 N.H. at 826, 678 A.2d at 148. Similarly, RSA 632-A:1, V defines sexual penetration to include the act of cunnilingus. Although the statute does not separately define cunnilingus, it is commonly understood that cunnilingus means "stimulation of the vulva or clitoris with the lips or tongue." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 554 (unabridged ed. 1961). The act does not require actual penetration.

There was ample evidence for the jury to find in this case that the act of cunnilingus occurred. One witness specifically testified that he saw one of the guests "licking [the dancer's] vagina" for "quite a while." A number of other witnesses testified that they saw physical contact between guests' faces and the dancer's "crotch." Since cunnilingus does not require physical penetration, it is irrelevant that no witness could specifically testify to such physical intrusion.

■ The defendant next argues that even if cunnilingus occurred, the evidence was insufficient for the jury to find that it occurred in exchange for consideration. To the contrary, the record shows that the jury could find that the dancer allowed guests to perform oral sex in exchange for money. One witness, for example, testified, "I'm quite sure [a guest] gave her five dollars, and she took it before she allowed him to perform oral sex." Other witnesses also testified that guests tendered money and were led to the mattress where the stripper allowed them to perform oral sex on her.

The defendant also contends that the State failed to prove that the defendant knowingly allowed the prostitution and that if prostitution occurred, the individuals who allowed it were not acting within the scope of their authority. We will first address the issue of agency.

As noted above, in the context of corporate criminal liability, the corporation acts through its agents and those agents must be acting within the scope of either their actual or apparent authority in order for the corporation to be liable for their actions. The defendant asserts that because the members of the fraternity announced that guests were not allowed to touch the dancers and that, if the dancer stayed too long with one guest, members of the fraternity would move her along, this indicated the lack of actual or apparent authority.

■ "[W]hether an agent has acted within his actual or apparent authority . . . is a question for the trier of fact." *Cohen v. Frank Developers, Inc.*, 118 N.H. 512, 517, 389 A.2d 933, 936 (1978). Apparent authority can result when the principal "fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act . . . in the name of the principal." 3 AM. JUR. 2D *Agency* § 79, at 586 (1986). In this case, there was testimony that the guests were told that if they paid more money the dancers would do more; that on more than one occasion guests were led to the mattress that was brought into the room by the brothers to perform oral sex in exchange for money;

and that at least one guest performed oral sex on the dancer for "quite a while." From these facts the jury could reasonably have found that members of the fraternity acted within the scope of their authority and on behalf of the corporation in allowing oral sex to be performed in exchange for money.

The defendant argues that the State failed to prove the requisite *mens rea* with regard to the prostitution charge, that is, that the defendant knowingly permitted oral sex to occur at the party. *See* RSA 645:2, I(e). "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b) (1986). The defendant argues that the material element to which the "knowingly" *mens rea* applies is permission. The defendant contends that there was no opportunity for the defendant to manifest its lack of permission before the oral sex occurred because the dancer's actions were unexpected.

██ Based on the facts of this case, the defendant's argument is without merit. As noted above, because the defendant is a corporation, and a corporation acts through its agents, the knowledge obtained by the agents of the corporation acting within the scope of their agency is imputed to the corporation. *See Bank of New England*, 821 F.2d at 856. There was testimony that several guests performed oral sex on the dancer and that on at least one occasion it occurred for several minutes. Moreover, the fraternity president testified that he "was very well in control" of the party. Therefore, even if the first act caught members of the fraternity by surprise, the jury could reasonably have inferred that the defendant knowingly permitted oral sex to occur from the defendant's failure to prevent the subsequent conduct. *Cf. State v. Smokey's Steakhouse, Inc.*, 478 N.W.2d 361, 362 (N.D. 1991) ("A corporation is not insulated from criminal liability merely because it published instructions and policies which are violated by its employee; the corporation must place the acts outside the scope of an employee's employment by adequately enforcing its rules.").

*II. Introduction of the Fraternity's Minutes Book*

The defendant next challenges the trial court's decision to allow the minutes book of the fraternity's 1993 meetings to be introduced into evidence for the purpose of impeachment. The defendant asserts that the book was improperly admitted pursuant to New Hampshire Rule of Evidence 608(b) and, even if it satisfies the requirements of Rule 608(b), it should have been excluded pursuant

to New Hampshire Rule of Evidence 403 because its prejudicial effect substantially outweighed its probative value.

 The defendant offered testimony that the fraternity had a policy to ensure that people under the age of twenty-one could not consume alcohol at fraternity events. During cross-examination, the State sought to impeach defense witnesses on the issue of the defendant's alcohol policy by means of minutes from fraternity meetings, which indicated that on a prior occasion the fraternity had plotted to circumvent the underage drinking law. At the time the minutes book was introduced by the State, the defendant objected. The only grounds for the objection fairly apparent on the record is the prejudicial nature of the entry. When the court offered to instruct the jury to consider the minutes book only for the purpose of impeachment, defense counsel responded that this satisfied his concerns. We therefore decline to rule on the issue of whether the minutes were properly admitted pursuant to Rule 608(b) because the defendant has failed to preserve this issue by making a specific objection and providing the trial court the opportunity to correct any error it may have made. *See State v. Brinkman*, 136 N.H. 716, 718, 621 A.2d 932, 934 (1993).

The defendant contends that the trial court erred in admitting the whole minutes book because there were a number of passages in the minutes in addition to the entry concerning the circumvention of the alcohol policy which prejudiced the jury against the defendant by making "the fraternity out to be a grubby, drunk, messy set of irresponsible underachievers." Because the defendant failed to make a specific objection on this basis, the trial court did not have the opportunity to consider it, and we will therefore not rule on it on appeal. *See id.*

 The only aspect of the defendant's Rule 403 objection that is apparent from the record is whether the prejudice from the entry in the minutes book concerning the prior attempt of the fraternity to circumvent the alcohol policy substantially outweighed its probative value. *See* N.H. R. EV. 403. We review the trial court's decision to admit evidence under Rule 403 for an abuse of discretion. *State v. Marti*, 140 N.H. 692, 694, 672 A.2d 709, 711 (1996). "To prevail on an abuse of discretion claim, the defendant must show that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted).

Under Rule 403,

> evidence is unfairly prejudicial if its primary purpose or
> effect is to appeal to a jury's sympathies, arouse its sense of

horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case.

*Id.* (quotation and brackets omitted).

 In the present case, the defendant introduced evidence of the fraternity's alcohol risk management policy. The State sought to counter the misleading impression created by this evidence by inquiring on cross-examination into instances reflected in the defendant's minutes book in which the fraternity attempted to skirt the law against underage drinking. "If a defense witness lies on the stand and thereby creates a misleading advantage, the State is entitled to counter with evidence to refute the impressions created by his testimony." *State v. Mello*, 137 N.H. 597, 601, 631 A.2d 146, 148 (1993) (quotation and ellipses omitted). This evidence is properly probative of the witness's truthfulness. *Cf. State v. Hurlburt*, 132 N.H. 674, 675-76, 569 A.2d 1306, 1307 (1990). In order to minimize the prejudicial effect of this evidence, the trial court twice instructed the jury that it may consider the minutes only for the purpose of impeachment. While the defendant challenges the effectiveness of these instructions on appeal because of the way in which they were worded, he expressed his satisfaction with them at trial. Therefore, we believe that the trial court did not abuse its discretion in admitting the minutes for purposes of impeachment.

### III. Constitutionality of the Defendant's Sentence

In addition to other terms not relevant for this opinion, the court sentenced the defendant to two years probation for the felony conviction of illegal sale of alcohol on the condition that

the defendant shall not allow the consumption on its premises of alcoholic beverages, and the defendant's premises shall be subject to unannounced searches by the Department of Corrections or the Durham Police Department to determine compliance with paragraph (2) of the conditions of suspension and any condition of probation. A violation found by the Durham Police Department shall be brought to the attention of the Department of Corrections.

 The defendant challenges the constitutionality of the sentence, arguing that the probation conditions violate part I, articles 15, 18, 19, and 33 of the New Hampshire Constitution and the fourth, eighth, and fourteenth amendments to the United States Constitu-

tion. We address the defendant's claims first under the State Constitution, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), considering cases from the federal courts and courts of other jurisdictions only as an analytical aid, *State v. Grant-Chase*, 140 N.H. 264, 266, 665 A.2d 380, 382, (1995), *cert. denied*, 116 S. Ct. 1431 (1996). When, as in the instant case, federal law is not more favorable to the defendant, *see Griffin v. Wisconsin*, 483 U.S. 868 (1987); *cf. Jones v. Murray*, 962 F.2d 302, 306-07 (4th Cir.), *cert. denied*, 506 U.S. 977 (1992), we make no separate federal analysis. *See Grant-Chase*, 140 N.H. at 266, 665 A.2d at 382.

We first address the defendant's contention that the probation condition is unconstitutional because it authorizes the probation officer to conduct unannounced warrantless searches. We begin by observing that "[u]nder the New Hampshire Constitution, all warrantless searches are *per se* unreasonable, unless they conform to the narrow confines of a judicially recognized exception." *State v. Sterndale*, 139 N.H. 445, 447, 656 A.2d 409, 410 (1995). Exceptions to the warrant requirement have been recognized "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873 (quotation omitted); *cf. State v. Drake*, 139 N.H. 662, 665, 662 A.2d 265, 267 (1995).

In *State v. Berrocales*, 141 N.H. 262, 681 A.2d 95 (1996), we recognized that a warrantless search of a probationer is constitutionally permissible. Requiring a probation officer to obtain a warrant supported by probable cause would make it prohibitively difficult for the probation officer to carry out the officer's responsibilities of rehabilitation and supervision.

Probationers are subject to extensive regulation and oversight by probation officers. *See* RSA ch. 504-A (Supp. 1996); RSA 651:2, V (1996 & Supp. 1996). Unannounced searches, even when the probation officer does not suspect that the probationer is violating his probation conditions, may be essential to adequately monitor the probationer's rehabilitation and protect the public. *Cf. Drake*, 139 N.H. at 665-66, 662 A.2d at 267 (noting that requiring a warrant and probable cause or reasonable suspicion would be impracticable due to special responsibilities of school officials). In discussing the need for warrantless searches of parolees, the Ninth Circuit has noted that

[i]n order to fulfill his dual responsibilities for helping the parolee to reintegrate into society and evaluating his progress, and for preventing possible further anti-social or

criminal conduct by the parolee, it is essential that the parole officer have a thorough understanding of the parolee and his environment, including his personal habits, his relationships with other persons, and what he is doing, both at home and outside it. It is equally important that this information be kept up to date. Much of this information can be obtained by methods which necessitate little or no invasion of the parolee's privacy, such as interviews with the parolee himself or with his employer, his family, or friends and visits to his house. However, these techniques have inherent limitations.

*Latta v. Fitzharris*, 521 F.2d 246, 249-50 (9th Cir. 1975) (citations omitted). These concerns apply equally in the context of probation. *See United States v. Consuelo-Gonzalez*, 521 F.2d 259, 266 (9th Cir. 1975); *cf.* RSA ch. 504-A.

We do not believe that a probation officer can adequately fulfill his statutory duties by simply monitoring the probationer's progress from a distance. A probationer may successfully conceal evidence of ongoing criminality or violations of probation conditions so that the probation officer has no suspicion of misconduct. *See Latta*, 521 F.2d at 250. To allow such behavior is counterproductive for the probationer's rehabilitation and exposes the public to preventable danger. At sentencing, the trial court specifically found that the probation conditions were necessary because the defendant had in the past plotted to circumvent the underage drinking laws and avoid detection by law enforcement.

■ Even where a warrant is not required, however, a search must still be reasonable. *See State v. Turmelle*, 132 N.H. 148, 153, 562 A.2d 196, 199 (1989). Although we hold, for the reasons stated above, that a warrant is not required to conduct a probation search, because probationers retain a degree of privacy interest, *see Consuelo-Gonzalez*, 521 F.2d at 265, the status of a probationer alone does not make every search reasonable. Probationary status, however, is one factor to consider when determining the reasonableness of a warrantless probation search. "[P]ersons conditionally released to society . . . may have a reduced expectation of privacy, thereby rendering certain intrusions by governmental authorities 'reasonable' which otherwise would be invalid under traditional constitutional concepts, at least to the extent that such intrusions are necessitated by legitimate governmental demands." *People v. Mason*, 488 P.2d 630, 633 (Cal. 1971), *cert. denied*, 405 U.S. 1016 (1972). In other words, "[w]hile it must be recognized that proba-

tioners, like parolees and prisoners, properly are subject to limita-
tions from which ordinary persons are free, it is also true that these
limitations in the aggregate must serve the ends of probation."
*Consuelo-Gonzalez*, 521 F.2d at 265.

In *State v. Berrocales*, we held that probation status coupled with
reasonable suspicion that the probationer violated the terms of his
probation made the warrantless search constitutionally permissible.
*Berrocales*, 141 N.H. at 264-65, 681 A.2d at 97. The case at bar
requires us to determine whether random warrantless searches of
probationers not based on particularized suspicion of misconduct
are constitutionally permissible if such searches are authorized as
part of the defendant's conditions of probation.

■■■ We believe that when a condition of probation authorizes
random warrantless searches and the condition is reasonably
related to the supervision and rehabilitation of the probationer, a
warrantless probation search is constitutionally permissible. *See
Griffin*, 483 U.S. at 880 (holding that a warrantless search of
probationer's home was constitutionally reasonable "because it was
conducted pursuant to a valid regulation governing probationers");
*cf. Vernonia School Dist. 47J v. Acton*, 115 S. Ct. 2386, 2396 (1995)
(holding that random suspicionless drug testing of high school
athletes is constitutionally reasonable under the fourth amend-
ment). When the grounds for a probation condition permitting
searches of a probationer's residence are limited to furthering the
goals of probation, the condition provides "a constitutionally ade-
quate substitute for a warrant." *Turmelle*, 132 N.H. at 153, 562 A.2d
at 199 (quotation omitted). Establishing reasonable grounds for the
search condition assures that the probation officer will not use the
search as a "subterfuge for uncovering evidence of criminal activi-
ty." *Id.* at 154, 562 A.2d at 200.

In this case, the defendant argues that the condition that the
fraternity have no alcohol on the premises is unreasonable because
the defendant was convicted for illegal sale of alcohol, not illegal
possession of alcohol. We disagree. In order for the grounds for the
probation condition to be reasonable, it need only further the
rehabilitation or supervision of the defendant. In *United States v.
Schoenrock*, 868 F.2d 289 (8th Cir. 1989), for example, the defendant
was convicted of conspiracy to distribute cocaine. *Id.* at 290. At
sentencing, the court expressed concern about the defendant's drug
and alcohol problem. *Id.* The court authorized random warrantless
searches of the defendant's premises, vehicle, or person for the
presence of alcoholic beverages or controlled substances. *Id.* at 290

n.3. After a search of the defendant's residence produced both alcohol and drugs, the defendant challenged the reasonableness of the probation conditions. *Id.* The court held:

> We have little difficulty in concluding that the probation conditions were reasonably related to rehabilitation and protection. The district court made careful findings that alcohol and substance abuse was a significant cause of Schoenrock's antisocial behavior, and carefully crafted the disputed terms so as to help Schoenrock change his ways while at the same time protecting the community.

*Id.* at 291.

As in *Schoenrock*, the trial court in this case specifically found that it was necessary to prohibit the consumption of alcohol on the fraternity premises. It authorized random searches because the evidence presented at trial "suggested a very clear effort on the part of that organization to come up with schemes to avoid the detection of law enforcement in the sale of alcohol to students who were minors at the University of New Hampshire." Although the defendant was not convicted of illegal possession or consumption of alcohol, it is clear from the findings of the trial court that prohibiting the consumption of alcohol and authorizing warrantless searches to determine compliance with this condition were essential to ensure the effective rehabilitation and supervision of the defendant.

The defendant contends that the search condition is unreasonable because it authorizes searches without prior notice or announcement. We believe that forewarning of a probation search would drastically undermine the supervisory deterrent effect of such searches, and is therefore not required. While we hold that the probation authorities do not need a particularized suspicion that the probationer is violating the conditions of its probation in order to conduct a search based on a reasonably imposed probation condition and do not need to announce their intention to search in advance, this does not give probation officers carte blanche to execute the search in an unreasonable manner. As courts have noted in the context of warrantless random parole searches:

> In a given case, what is done may be so unreasonable as to require that the search be held to violate the Fourth Amendment. For example, harassment or intimidation is no part of a parole officer's job. In short, we do not accept the

notion that parole officers may conduct full-blown searches of parolees' homes whenever and as often as they feel like it. To do so would practically gut the principle that parolees are entitled to some privacy. Moreover, it would not advance the goals of the parole system. Indeed, it has been suggested that providing parole authorities with an unlimited power to conduct indiscriminate searches actually undermines the rehabilitation process.

*Latta*, 521 F.2d at 252; *see United States v. Follette*, 282 F. Supp. 10, 13 (S.D.N.Y. 1968) (noting that "a search could become 'unreasonable' . . . if made too often or if made at an unreasonable hour or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the parole officer"), *aff'd*, 418 F.2d 1319 (2d Cir. 1969), *cert. denied*, 402 U.S. 984 (1971). Therefore, in order for a warrantless probation search condition to be constitutional it must be related to the rehabilitation or supervision of the defendant, and the search itself must be conducted in a manner that is reasonable in time, scope, and frequency.

Finally, the defendant argues that the provision of the sentence allowing the Durham police to conduct searches of the fraternity house violates the State Constitution. At oral argument, the State conceded that to the extent the probation condition allowed the Durham police independently to search the defendant's house, the condition was invalid. We agree.

Rehabilitation and protection of the public are the central objectives of a sentence of probation. *See Berrocales*, 141 N.H. at 264, 681 A.2d at 96; *see also* RSA 651:2, V. Probation officers are charged with the duty "to assist [probationers] in establishing law-abiding lives while monitoring their behavior through office, home, work, and other contacts to insure that they comply with their probation . . . conditions." RSA 504-A:12, II (Supp. 1996). Police officers, on the other hand, are charged with the responsibility of enforcing the criminal laws of the State and protecting the public by the investigation of criminal activity. *See* RSA 104:6 (1990); RSA 105:3 (1990); RSA 106-B:12 (1990). While probation officers also have some powers of law enforcement, *see* RSA 504-A:12 (Supp. 1996), these powers are intended to assist the probation officer in his duties to rehabilitate the defendant and protect the public. *See Consuelo-Gonzalez*, 521 F.2d at 266-67; *cf. Latta*, 521 F.2d at 249. Because of the probation officer's responsibilities toward the probationer and the public, "[p]robation authorities . . . have a special and unique interest in invading the privacy of probationers."

*Consuelo-Gonzalez*, 521 F.2d at 266. This interest, however, does not extend to law enforcement officers. *See id.; cf. Griffin*, 483 U.S. at 876-77 (comparing duties of probation officer and police officer). The police should not be able to use the probation officer as a "stalking horse" to further their own independent criminal investigations by circumventing the warrant requirement. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994).

 We hold that because the police do not have the same special statutory responsibilities toward the probationer as does the probation officer, a condition of probation authorizing the police to conduct warrantless searches is unreasonable under part I, article 19 of the New Hampshire Constitution. Nothing said here, however, "is intended to preclude mutually beneficial cooperation between probation officers and other law enforcement officials. For example, a proper visitation by a probation officer does not cease to be so because he is accompanied by a law enforcement official." *Consuelo-Gonzalez*, 521 F.2d at 267.

Because the sentence in this case allows the police to search independently of probation officers, and because it does not require that the probation officer's search be conducted in a reasonable manner, we vacate the sentence in this case and remand for resentencing not inconsistent with this opinion.

*Convictions affirmed; sentence vacated; remanded for resentencing.*

BROCK, C.J., and BRODERICK, J., concurred in part and dissented in part; the others concurred.

BROCK, C.J., and BRODERICK, J., concurring in part and dissenting in part: We concur in parts I and II of the majority opinion. Because we believe the majority's interpretation of part I, article 19 of the New Hampshire Constitution as applied in the probation context is in error, we respectfully dissent from part III of the majority opinion.

In the majority's view, the probation search condition at issue is constitutionally permissible under part I, article 19 even though it allows probation officers the freedom to conduct random, unannounced searches of the person, home, and possessions of the probationer — and, quite possibly, of nonprobationer third parties — without so much as a shred of individualized suspicion that the probationer has violated the terms of his or her probation. The majority apparently believes that the constitutional prohibition against unreasonable searches, in the case of probationers, requires only that a probation condition authorizing searches "be related to

the rehabilitation or supervision of the [probationer], and the search itself . . . be conducted in a manner that is reasonable in time, scope, and frequency." *Supra* at p. 31. This interpretation of our State constitutional protection against unreasonable searches and seizures finds no support in our history or the precedents of this court.

Like the fourth amendment to the United States Constitution, with which it shares a common ancestry, *see State v. Pellicci*, 133 N.H. 523, 539, 580 A.2d 710, 720 (1990) (Brock, C.J., concurring), part I, article 19 has "both the virtue of brevity and the vice of ambiguity," J. LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT: A STUDY IN CONSTITUTIONAL INTERPRETA-TION 42 (1966). History provides us some guidance in our attempts to interpret the constitutional mandate that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions," N.H. CONST. pt. I, art. 19. *See* LANDYNSKI, *supra* at 19-20.

The primary object of constitutional provisions like part I, article 19 was the full-scale search of persons, homes, and property by governmental authorities absent any individualized suspicion of wrongdoing. *See* Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. MEM. L. REV. 483, 489 (1995); LANDYNSKI, *supra* at 20. As one commentator has observed, "the historical record demonstrates that the framers believed that individualized suspicion was an *inherent* quality of reasonable searches and seizures." Clancy, *supra* at 489. It follows that part I, article 19 should be interpreted as requiring, at a minimum, that the State have some degree of suspicion justifying a search at its inception. *See* Clancy, *supra* at 530-31; *cf. Chandler v. Miller*, 117 S. Ct. 1295, 1301 (1997) (stating that reasonable searches under the fourth amendment "ordinarily must be based on individualized suspicion of wrongdoing"). This court has consistently adhered to this principle, reasoning, for example, that to justify even the relatively limited privacy intrusion of an investigatory stop, the investigating officer must have some articulable suspicion that a crime has occurred. *See, e.g., State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137-38 (1985).

This principle is of particular moment when, as in this case, the search involves a person's home. History teaches that "the searches and seizures which deeply concerned the colonists, and which were foremost in the minds of the Framers, were those involving invasions of the home." *United States v. Chadwick*, 433 U.S. 1, 8 (1977). This court has acknowledged that the protections afforded

by the fourth amendment and part I, article 19 "are never in sharper focus" than when viewed in respect to the home. *State v. Thompson*, 132 N.H. 730, 733-34, 571 A.2d 266, 268-69 (1990); *see State v. Chaisson*, 125 N.H. 810, 816, 486 A.2d 297, 302 (1984). Accordingly, the court has concluded that when "entry is made into an individual's private dwelling, where there exists a strong expectation of privacy and protection from government intrusion, the requirement of a warrant is particularly stringent." *State v. Santana*, 133 N.H. 798, 803, 586 A.2d 77, 80 (1991) (quotations omitted).

It is true that suspicionless search regimes may be valid in "certain limited circumstances." *Chandler*, 117 S. Ct. at 1298. Among the prerequisites to the validity of such a search regime, however, is that it implicate only minimal privacy interests. *See id.* at 1301. Unlike a courthouse weapons search, *see State v. Plante*, 134 N.H. 585, 588, 594 A.2d 165, 167, *cert. denied*, 502 U.S. 984 (1991), or a brief stop for questioning at a sobriety checkpoint, *see Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 447, 451 (1990), a search conducted under the authority of the sentencing order in this case implicates significant privacy interests; indeed, it could involve extensive — and potentially unlimited — rummaging through an individual's personal belongings and home. As compared to those few suspicionless search regimes that have been upheld, a search executed under this sentencing order could scarcely be characterized as minimally intrusive. *See, e.g., Sitz*, 496 U.S. at 451-52 (describing as "minimal" the intrusion occasioned by stops of motorists at sobriety checkpoints).

The majority nonetheless authorizes suspicionless searches of probationers and their homes, concluding that individualized suspicion, the most fundamental protection of part I, article 19, will hinder the State's ability to supervise probationers with the certainty the State desires. In some cases it might. But it is well established under our constitution that the privacy interests of individuals — particularly in their homes — take precedence over the State's needs; this is the underlying premise of part I, article 19. *Cf. State v. Canelo*, 139 N.H. 376, 386, 653 A.2d 1097, 1104-05 (1995). In other words, the question whether a suspicionless search regime is "better" than a suspicion-based regime is irrelevant, for the framers of our constitution have already resolved this issue. *See Vernonia School Dist. 47J v. Acton*, 115 S. Ct. 2386, 2398 (1995) (O'Connor, J., dissenting) (observing in regard to the fourth amendment that "it is not open to judges or government officials to decide on policy grounds which is better and which is worse").

Despite its often narrow interpretation of the protections afforded citizens under the fourth amendment, the United States Supreme Court has not sanctioned suspicionless searches of a probationer's home, and the majority errs in assuming that no separate federal analysis is required in this case. In *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the Supreme Court upheld a warrantless search of a probationer's residence by probation officers because the search was conducted "pursuant to a regulation that itself satisfie[d] the Fourth Amendment's reasonableness requirement." *Id.* at 873. The regulation authorized warrantless searches, with the approval of a supervisor, so long as the probation officer had "reasonable grounds" to believe contraband was present. *Id.* at 870-71. Significantly, the *Griffin* Court did not so much as imply that a regulation allowing suspicionless searches would have been constitutional, and the case can not fairly be read to support the proposition that such a regime would "fit within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler*, 117 S. Ct. at 1298.

Nor did the Court specifically address the question whether the search in *Griffin* would have satisfied the fourth amendment absent the existence of a constitutionally valid regulation. Courts considering this question, however, have concluded that absent such a regulation, the Supreme Court likely would interpret the fourth amendment as requiring at least that probation officers have some individualized suspicion prior to searching a probationer and his home. *See, e.g., United States v. Giannetta*, 909 F.2d 571, 576 (1st. Cir. 1990) (noting that condition allowing search by probation officer without suspicion "would appear to conflict with the dictates of *Griffin*"); *Com. v. LaFrance*, 525 N.E.2d 379, 381 (Mass. 1988) (suspecting that "Supreme Court would approve of a warrantless search of a probationer's residence based on . . . reasonable suspicion"). Indeed, given the traditional importance of privacy in the home, it seems doubtful that the Court would uphold suspicionless searches of a probationer's residence.

Apart from its constitutional analysis, the majority's opinion presents practical problems. In *State v. Berrocales*, 141 N.H. 262, 681 A.2d 95 (1996), this court acknowledged that the special needs of the State in the probation context — rehabilitation and protection of the public — justify an exception to the requirements of probable cause and a warrant, and the court held that a search of a probationer's home will be valid if premised upon a reasonable suspicion that the probationer has violated the terms of probation. *See id.* at 264, 681 A.2d at 96-97. The majority in this case eliminates

the requirement of individualized suspicion to further the State's interests in public safety and rehabilitation. In fact, such a search regime more likely will undermine both interests:

> [A] person should not be released on . . . probation when the risks are so substantial that it is necessary to authorize the highly intrusive practice of full searches of living quarters based upon nothing other than the risks as perceived at the time of release. Stated another way, it is inherently inconsistent to release a person on probation . . . for purposes of rehabilitation and at the same time condition that release upon that person's residence being subject to indiscriminate and highly intrusive searches . . . .

4 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.10(d), at 777 (3d ed. 1996) (footnotes omitted). Under the majority opinion, there is little practical difference between a probationer in his home and an inmate subject to the privacy restrictions attendant to incarceration; if the former requires the same degree of supervision as the latter, both the State Constitution and public safety would be better served by imprisonment.

To be sure, as explained in *Berrocales*, the rights of probationers under part I, article 19 may in certain cases be more circumscribed than those of nonprobationers. *See Berrocales*, 141 N.H. at 264, 681 A.2d at 96. This does not mean that probationers (or their family members) may be stripped of all meaningful protections against searches and seizures. *See United States v. Jeffers*, 573 F.2d 1074, 1075 (9th Cir. 1978) (per curiam) (implicitly recognizing that probationers enjoy some fourth amendment protections). "That there is a less demanding constitutional standard to be met in justifying a warrantless search of a . . . probationer does not authorize the court to impose an unconstitutional sanction as a condition of probation." *People v. Suttell*, 492 N.Y.S.2d 192, 195 (App. Div.), *appeal denied*, 488 N.E.2d 128 (N.Y. 1985). To the extent the sentencing order in this case allows searches of a residence absent some individualized suspicion by a probation officer that the defendant has violated or will violate the terms of probation, it is constitutionally invalid.

The majority today renders illusory any privacy interest retained by probationers. The right to enjoy the privacy of one's home free from unjustified intrusion by the State is among the constitutional freedoms that comprise "our legacy of ordered liberty." *State v.*

*Cavanaugh*, 138 N.H. 193, 201, 635 A.2d 1382, 1387 (1993) (Batchelder, J., dissenting). One who defends these freedoms "must share his foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply." *Kopf v. Skyrm*, 993 F.2d 374, 380 (4th Cir. 1993). These freedoms are rarely lost or compromised in sweeping pronouncements; rather, their erosion, when it occurs, most often happens by well-intentioned and incremental, even subtle, steps. The majority takes such a step today, and from that decision we respectfully dissent.