# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DARLA MOTLEY; JUAN JAMERSON,
    *Plaintiffs-Appellants,*

    v.

BERNARD PARKS; DARYL GATES;
GERALD CHALEFF; HERBERT
BOECKMAN; T. WARREN JACKSON;
ROBERT M. TALCOTT; RAYMOND C.
FISHER; GUADALUPE SANCHEZ;
GREGORY KADING; AL RUEGG;
JAMES BLACK; LAWRENCE WEBSTER;
DEAN HANSELL,
    *Defendants-Appellees.*

No. 02-56648

D.C. No.
CV-00-01472-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted En Banc
June 23, 2005—San Francisco, California

Filed December 30, 2005

Before: Mary M. Schroeder, Chief Judge, Betty B. Fletcher,
Harry Pregerson, Stephen Reinhardt, Alex Kozinski,
Andrew J. Kleinfeld, Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, Richard A. Paez, and Jay S. Bybee,
Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Reinhardt

16823

## COUNSEL

Stephen Yagman; Marion R. Yagman; Kathryn S. Bloomfield, Yagman & Yagman & Reichmann & Bloomfield, Venice Beach, California, for the plaintiffs-appellants.

Rockard J. Delgadillo, City Attorney; Janet G. Bogigian, Deputy City Attorney, Los Angeles, California, for defendants-appellees Bernard Parks, Daryl Gates, Gregory Kading and Albert Ruegg.

Debra W. Yang, United States Attorney; Leon W. Weidman, Assistant United States Attorney, Chief, Civil Division; David Pinchas, Assistant United States Attorney, Los Angeles, California, for defendants-appellees James Black and Larry Webster.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Allen Crown, Acting Senior Assistant Attorney General; Darrell Lepkowsky, Supervising Deputy Attorney General; Robert Helfand, Elizabeth A. Keech, Deputies Attorney General, Los Angeles, California, for defendant-appellee Guadalupe Sanchez.

---

# OPINION

SILVERMAN, Circuit Judge:

We took this case en banc to clarify a number of issues in this circuit surrounding parole-related searches. We hold that, before conducting a warrantless search pursuant to a properly imposed parole condition, law enforcement officers must have probable cause to believe that the parolee resides at the house to be searched. In this case, they did. We do not, however, decide whether law enforcement officers also need particularized suspicion of wrong-doing before conducting such a search because, while this appeal was pending, the Supreme Court granted certiorari on that issue. It is sufficient for us to conclude that, at the time the officers searched plaintiffs' home, it was not clearly established that any suspicion of wrong-doing on the part of the parolee was needed.

Accordingly, we affirm the grant of summary judgment in favor of the officers on the illegal search claim. Also, we affirm the dismissal of the *Monell* claims against former LAPD police chiefs Parks and Gates, but reverse the summary judgment to Officer Kading on the excessive force claim.

## FACTS AND DISTRICT COURT PROCEEDINGS

The material facts, as construed in the light most favorable to plaintiffs, are as follows.[1] On February 20, 1998, Janae

---

[1] We recognize that some of the material facts are contradicted by the officers' deposition testimony and declarations, but accept Motley's reci-

Jamerson, a member of the Four Trey Crips gang, was released on parole from state prison. As a condition of his parole, Jamerson was required to consent that his person, residence, and any property under his control could be searched at any time, by any agent of the Department of Corrections or any other peace officer, with or without a warrant. *See* Cal. Penal Code § 3067.[2]

During the month of January 1999, Darla Motley, Jamerson's then-girlfriend, moved into an apartment located at 416 East 40th Place in Los Angeles. At some point, Jamerson also lived there. However, Motley testified that "everything" was in her name and that she paid the rent and all bills associated with the apartment. Jamerson's mother and brother lived in another apartment at that address. On February 3, 1999, Jamerson was taken back into custody as a result of a parole violation. A few days later, Motley gave birth to their son, Juan Jamerson.

Approximately six weeks later, on the morning of March 18, 1999, Los Angeles Police Department Officer Albert Ruegg held a briefing for LAPD officers, officers from the federal Bureau of Alcohol, Tobacco and Firearms, and California state parole officers regarding the planned searches of ten parolees' residences in the Newton Street area. These officers were all part of the Newton Street task-force, a combined

---

tation of the facts for two reasons. This case arises in the posture of a motion for summary judgment; accordingly, we are required to view all facts and draw all reasonable inferences in favor of the nonmoving party, Motley. *See Hope v. Pelzer*, 536 U.S. 730, 733 n.1 (2002). In addition, here we are asked to resolve issues of qualified immunity; this inquiry again requires us to take the facts "in the light most favorable to the party asserting the injury." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[2]"Any inmate who is eligible for release on parole pursuant to this chapter shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." Cal. Penal Code § 3067(a).

state and federal effort organized in November of 1998 to combat gang-related violence and criminal activity. In March 1999, the task force was investigating the sudden rise in shootings and armed robberies taking place in the Newton Street area. Janae Jamerson was one of the ten parolees with gang connections identified to be living in the Newton Street area in the spring of 1999. The officers concede they had no reasonable suspicion to believe that Jamerson was then-involved in any crime; they were simply contacting and searching local parolees with gang connections as a way to "clean up" the Newton Street neighborhood.

Sometime before March 18, Officer Ruegg had directed a member of his team to prepare "packages" on suspected gang-member parolees in the Newton Street area. The proper preparation of a package entailed verifying whether a parolee was on active parole and compiling address and identifying information. Ruegg was informed that Jamerson's last known address was the apartment at 416 East 40th Place and that he was on active parole. During the March 18 briefing, the officers charged with preparing the packages relayed the pertinent information to the members of the various search teams.

At approximately 10:00 or 10:30 that morning, four task-force officers from the various agencies went to search what they believed to be Jamerson's residence. The two ATF officers, James Black and Larry Webster, proceeded to the rear of the apartment unit; California Parole Agent Guadalupe Sanchez and LAPD officer Gregory Kading went to the front door and knocked loudly.

Motley testified at her deposition that when she came to the door, Kading identified himself as an LAPD officer, said that he was there with Jamerson's parole officer, and asserted that they had a warrant to search the apartment. In fact, the officers did not have a warrant, and Jamerson's parole officer was not present. An exchange regarding Jameron's whereabouts ensued. Motley told the officers that Jamerson did not live

there and that he was in custody. One of the officers replied that Jamerson had been released three days earlier. Motley countered that she knew Jamerson was still in custody. The officers then asked who was inside with her, and Motley replied that only she and her five-week-old son, Juan, were at home. Finally, one of the officers told Motley that they needed to conduct the search and that if she did not let them in, they would arrest her for interfering with the search and Juan would be put in foster care. At this point, Motley unlocked the security gate and Kading, Sanchez, and Black entered the apartment. With their firearms drawn, Kading and Black searched the house for Jamerson; Webster eventually joined the others, but remained primarily in the living room.

During the search, Kading entered Motley's bedroom with his firearm unholstered. Juan was lying on Motley's bed in the bedroom. According to Motley, upon entering the room, Kading pointed his gun at Juan and kept the firearm trained on the infant while he searched the room; Kading put his gun away only when another officer came in and helped him examine a box at the foot of the bed. The officers spent at least twenty minutes searching Motley's bedroom.

After the officers left, Motley called Jamerson's parole officer, Ms. Smith, and told her that officers had come and searched her entire home. Ms. Smith stated that she did not authorize the search and confirmed that Jamerson was still in custody. A few weeks after the search of her residence, Motley moved to San Pedro, because she said that she was afraid to stay in the Newton Street area with her son.

Motley, on behalf of herself and her son Juan, filed a § 1983 action alleging that the officers violated their Fourth Amendment rights, used excessive force, and conspired to violate their Fourth Amendment and equal protection rights, and that the law enforcement agencies were liable for the officers' actions under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The officers moved for summary judg-

ment asserting that they were immune from suit. The district court agreed and granted summary judgment on all claims. Motley argues on appeal that the officers were not entitled to qualified immunity for the unlawful search, the use of excessive force against her infant son, and the *Monell* claims against Gates and Parks.[3]

## ANALYSIS

## I.   Qualified Immunity Standard

A private right of action pursuant to 42 U.S.C. § 1983 exists against law enforcement officers who, acting under the color of authority, violate federal constitutional or statutory rights of an individual. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). The defense of qualified immunity, however, shields an officer from trial when the officer "reasonably misapprehends the law governing the circumstances she confronted," even if the officer's conduct was constitutionally deficient. *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 599 (2004) (per curiam).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court laid out the framework for determining an officer's entitlement to qualified immunity. The threshold inquiry requires a court to ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. The inquiry ends at this stage if no constitutional right is found to have been violated; the plaintiff cannot prevail. *Id.* If, on the other hand, the plaintiff's allegations do make out a constitutional injury, then the court must determine whether that constitutional right was clearly established at the time of the violation. *Id.* If the right was not clearly established, the qualified immunity doctrine shields the officer from further litiga-

---

[3]Motley does not appeal the district court's rulings on her conspiracy claims.

tion. *Id*. Finally, even if the violated right was clearly established, the *Saucier* court recognized that it may be difficult for a police officer fully to appreciate how the legal constraints apply to the specific situation he or she faces. Under such a circumstance, "[i]f the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id*. at 205.

The parties urge us to skip the first step of the *Saucier* analysis. They ask us to assume that the officers violated Motley's constitutional rights by conducting a warrantless and suspicionless search of her apartment without sufficient reason to believe Jamerson lived there, and determine whether those rights were clearly established at the time of the search. The Supreme Court has placed strong emphasis on the need to concentrate at the outset on the definition of the constitutional right. *See Brosseau*, 125 S. Ct. at 598; *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier*, 533 U.S. at 201. The threshold inquiry is intended to "set forth principles which will become the basis for a holding that a right is clearly established" in later cases. *Saucier*, 533 U.S. at 201. "This is the process for the law's elaboration from case to case," and "[t]he law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Id*.; *see also Wilson*, 526 U.S. at 609 ("Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."); *Robinson v. Solano County*, 278 F.3d 1007, 1012-13 (9th Cir. 2002) (en banc) (discussing *Saucier*).

Given the Supreme Court's emphasis on our duty to clarify the constitutional standards governing law enforcement officers in the performance of their duties, we find it necessary to decide, first, what level of knowledge the officers needed to support the belief that Jamerson resided at the 40th Place

address. In other words, how certain did they have to be that they were at the right residence?

However, resolution of the related constitutional issue, whether the officers also needed particularized suspicion of wrong-doing on Jamerson's part, poses unique circumstances that warrant deviating from *Saucier*'s threshold inquiry. The Supreme Court has granted certiorari in *Samson v. California* on the precise issue involved in this case. *See* 126 S. Ct. 34 (2005).[4] Thus, the very justification for *Saucier*'s first step is inapplicable; avoiding the constitutional question will not impede the elaboration of constitutional principles, and answering the constitutional question would foster neither certainty nor finality. The confluence of our consideration of this case en banc and the Supreme Court's concurrent review of the same issue presents an extraordinary circumstance not before presented.[5] In this unusual circumstance, we bypass *Saucier*'s first step and decide only whether it was clearly established at the time of the search that the officers needed some suspicion of wrongdoing.

---

[4]The question presented for review in the petition for certiorari is: "Does the Fourth Amendment prohibit police from conducting a warrant-less search of a person who is subject to a parole search condition, where there is no suspicion of criminal wrongdoing and the sole reason for the search is that the person is on parole?" Petition for Writ of Certiorari, *Samson v. California*, No. 04-9728, 2005 WL 2367028 (Apr. 12, 2005).

[5]We note that two other circuit courts have avoided constitutional determinations at the first step of the *Saucier* analysis where they were asked to decide novel issues of state law that would have been "provisional only and subject to reversal as a result of subsequent state court rulings." *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 60 (2d Cir. 2003); *see also Tremblay v. McClellan*, 350 F.3d 195, 200 (1st Cir. 2003) ("*Saucier* . . . surely did not mean to require federal courts to define and clarify unclear state statutes when this is wholly unnecessary to decide the case as hand."). Although we need not address the substance of that analysis, this case presents an even more compelling reason to proceed to step two of the *Saucier* analysis.

## II. Section 1983 Illegal Search Claim

### A. Probable Cause Is Needed to Establish Residence

[1] Where a law enforcement officer's observations support "a reasonable belief" that a parolee resides at a particular address, this "provide[s] a reasonable basis for [a parole] search." *United States v. Dally*, 606 F.2d 861, 863 (9th Cir. 1979) (per curiam). We have not had occasion to elaborate further the underpinnings of our analysis in the context of a parole search. Nevertheless, the development of our precedent in related contexts proves instructive.

In *Perez v. Simmons*, officers searched the home of Irma Perez, without her consent, while looking for her brother who was on probation and the subject of an arrest warrant. 884 F.2d 1136, 1141 (9th Cir. 1989), *as amended* 900 F.2d 213 (9th Cir. 1990), *and as corrected* 998 F.2d 775 (9th Cir. 1993). We stated that before law enforcement officers may search a home to execute a search warrant, they must have "reasonable grounds for believing" that the subject of the warrant resides in the apartment. *Id.* at 1140; *see also United States v. Albrektsen*, 151 F.3d 951, 953-54 (9th Cir. 1998) (applying same standard). In the absence of this requirement, we risk diminishing the Fourth Amendment protections owed to the homeowner.

Our subsequent decision in *Watts v. County of Sacramento*, 256 F.3d 886 (9th Cir. 2001), comports with this holding. There, law enforcement officers received a tip that a murder suspect was living at a particular address with his girlfriend and two small children. The address differed from the suspect's last known address. When the officers arrived at the address identified by the tipster, the plaintiff answered the door. The officers observed that the plaintiff generally fit the description of the suspect; moreover, and unfortunately for the plaintiff, both the murder suspect and the plaintiff had the same first name, Chris. The officers handcuffed the plaintiff

and performed a protective sweep of the house. At some point, the officers realized that they had the wrong person in custody and, after thirty to forty-five minutes, released the plaintiff and explained the mistake to him. On appeal, we reversed the district court's grant of summary judgment to the officers and held that an officer must have a "reasonable belief" that the suspect named in an arrest warrant resides in a third party's home. *Id.* at 889-90 (relying on *Payton v. New York*, 445 U.S. 573, 603 (1980)).

**[2]** These cases make clear that a search conducted without consent or a search warrant is permissible only when the officers have some heightened knowledge that they are at the address where either the parolee or the subject of an arrest warrant resides. The underlying analysis fits equally well here. A reasonable parole search conducted by law enforcement officers without a warrant does not run afoul of the Fourth Amendment. *See Griffin v. Wisconsin*, 483 U.S. 868, 872-75 (1987). Generally, a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides, even if others also reside there. But they have to be reasonably sure that they are at the *right* house. Nothing in the law justifies the entry into and search of a third person's house to search for the parolee. "The Fourth Amendment's protection against unreasonable searches in a person's home is not diminished by the mere presence of a guest in the home." *Perez*, 884 F.2d at 1141. In other words, the parole condition indicates only the parolee's acquiescence to a warrantless search of his own residence. Absent this provision and the existence of exigent circumstances, officers must obtain consent or a warrant to enter a house. *See Moore v. Vega*, 371 F.3d 110, 116 (2d Cir. 2004) ("Because plaintiff is not a parolee, she cannot be subjected to the same burdens upon her privacy, and the departures from the usual warrant and probable-cause requirements allowed with respect to parolees are not justified for her.").

**[3]** Recently, we attempted to reconcile our previous holdings. Following analysis of federal precedent, we concluded

that when it came to whether a person lives at a particular residence, the "reason to believe" or "reasonable belief" standard "should be read to entail the same protection and reasonableness inherent in probable cause." *United States v. Gorman*, 314 F.3d 1105, 1111-15 (9th Cir. 2002); *see also Watts*, 256 F.3d at 890 ("Courts have generally required substantial evidence pointing to the suspect's co-resident status to create a reasonable belief that he lives in the home of a third party."); *United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991) (determining that police must have probable cause to believe the subject of an arrest warrant is an actual resident of a location before entering the premises to execute the warrant). We see no reason to depart from that conclusion here.

> These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Brinegar v. United States*, 338 U.S. 160, 176 (1949).

**[4]** Requiring officers to have probable cause to believe that a parolee resides at a particular address prior to conducting a parole search protects the interest of third parties. Law enforcement officers are allowed to search a parolee's resi-

dence, but they must have probable cause to believe that they are *at* the parolee's residence. In sum, we hold that before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched.

### B.  The Officers Had Probable Cause to Believe That Jamerson Resided with Motley

We now turn our attention to whether appellees' conduct deprived Motley of this right. Officer Ruegg supervised the Newton Street task-force; Kading, Sanchez, and Black conducted the search; and Webster was an agent in training who remained in the living room during the search. The officers contend that they reasonably relied on the information gathered by and received from the LAPD regarding Jamerson's parole status and last known address. Ruegg testified that to the best of his recollection, approximately a month before the search he assigned the task of compiling and confirming Jamerson's information to a member of his unit.[6] In addition to that information, Kading testified that he had contact with Jamerson on previous occasions, including at the 416 East 40th Place residence. During at least one of those prior interactions, Jamerson and his grandmother confirmed that Jamerson lived at the location at issue. Indeed, Sanchez testified that when they arrived at the apartment building, Kading indicated that Jamerson lived in the rear unit.[7] Kading additionally testified that he independently knew Jamerson was on parole.

---

[6]Motley argues that the information was compiled in November 1998, and as a result, it was stale and unreliable. The district court found, as do we, that this argument is not supported by the record. The most that can be said from the record is that the task-force started in November 1998 and began collecting "broad information" at that time. As for specific information related to the address in question, the uncontradicted evidence established that such information was developed "sometime within that month prior to" March 18, 1999, the date of the search.

[7]The following exchange took place at Sanchez's deposition:

  Q:   How did you choose to go to the [structure] in the back?

A supervisor can be liable under § 1983 if he "set[s] in motion a series of acts by others . . . , which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotation marks and brackets omitted). Liability can exist without direct participation by the supervisor. *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc). However, "[a]bsent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake *de novo* investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent." *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992). There is no evidence in the record that Ruegg knew or had any reason to believe that the investigation regarding Jamerson's last known address and parole status was inadequate or incompetent.

**[5]** Effective and efficient law enforcement requires cooperation and division of labor to function. For that reason, law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers. *See Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568 (1971); *United States v. Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980). We recently reaffirmed this principle in *United States v. Jensen*, 425 F.3d 698 (9th Cir. 2005), where we held that, under the "collective knowledge doctrine," probable cause may be based on "the collective knowledge of all the officers involved in the investigation and all of the reason-

---

A: That was information that LAPD had.

Q: What information was communicated to you that you should go to the structure in the back? Did someone tell you, "Go to the one over there," or something like that?

A: I believe it was a sergeant that indicated that it was the rear residence.

able inferences that may be drawn therefrom." *Id.* at 705 (internal quotation marks omitted). We emphasized that an officer "was entitled to rely on the observations and knowledge of the others, even though some of the critical information had not been communicated to him." *Id.* (brackets and internal quotation marks omitted).

Typically, of course, "only one or a few officers plan and lead a search, but more — perhaps many more — help execute it. The officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions." *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2002), *aff'd*, 540 U.S. 551 (2004). "Line officers, on the other hand, are required to do much less." *Id.* at 1028. All officers, however, have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if insufficient details are relayed. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1293 n.16 (9th Cir. 1999). We have said, for example, that when conducting a search pursuant to a warrant, the officers involved should familiarize themselves with the nature and scope of the search authorized by the warrant. *See Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986). The lynchpin is whether the officer's reliance on the information was objectively reasonable. *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985).

**[6]** During the briefing on the morning of the search, other officers provided appellees with Jamerson's parole status and last known address. We agree with the district court that the officers' reliance on this information was objectively reasonable. Where an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous. *See id.* at 232; *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976) ("A facially valid direction from one officer to another to stop a person or a vehicle insulates the complying officer from assuming per-

sonal responsibility or liability for his act done in obedience to the direction."). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar*, 338 U.S. at 175; *see also Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) ("[P]robable cause . . . demands no more than a proper assessment of probabilities in particular factual contexts." (internal quotation marks omitted)). Given that the appellees had probable cause to believe that Jamerson resided with Motley, they acted lawfully in searching the residence, even though it turned out that only Motley was there at the time.[8]

We also affirm the grant of summary judgment in favor of ATF Agent Webster on the independent ground that he did not participate in the search of the premises. *See Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (discussing that merely being present at the scene of an alleged constitutional violation, without personal participation, is insufficient to hold individual officer liable).

[7] Finally, we conclude that because the officers had probable cause to believe that they were at Jamerson's residence, they were entitled to maintain that belief until "presented with convincing evidence that the information they had relied upon was incorrect." *Moore*, 371 F.3d at 118. Motley's statement that Jamerson did not live at that address, coming from a less-than-disinterested source, did not undermine the information the officers previously had received from their advance briefing. It is not an unheard-of phenomenon that one resident will

---

[8]We additionally note that Motley and Jamerson's infant son continued to live at the 40th Place apartment, and a good argument can be made that the apartment remained Jamerson's "residence" even though he was "temporarily away." We need not decide that issue. It is sufficient to hold that on March 18, 1999, the officers had probable cause to believe that Motley's home was also Jamerson's.

tell police that another resident is not at home, when the other resident actually is hiding under a bed when the police come to call. *See*, *e.g.*, *United States v. Amburn*, 412 F.3d 909, 913 (8th Cir. 2005) (recounting that suspect was discovered hiding under a bed after two friends claimed he had "left").

As explained above, the officers required probable cause to believe that the apartment on 40th Place was Jamerson's, and they met that burden. The next question is whether it was clearly established at the time they searched Motley's apartment that the officers required particularized suspicion of wrong-doing on Jamerson's part. For the reasons that follow, we hold that it was not.

## C.  It Was Not Clearly Established That Appellees Needed Any Suspicion of Wrong-Doing

**[8]** "To accomplish the purpose of parole, those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972). A state may closely supervise parolees and impinge on their privacy rights to a greater extent than on the rights of the general public because administration of the parole system is within the state's "special needs" to ensure that the parolee observes the conditions of parole. *Griffin*, 483 U.S. at 873. Parolees retain some Fourth Amendment safeguards, *id*. at 874, but are not entitled to the full panoply of rights and protections possessed by the general public.

**[9]** The touchstone of the Fourth Amendment is reasonableness. Aside from that well-settled principle, though, the law concerning what level of suspicion officers had to have before conducting a parole search — if any — was in "disarray" when appellees searched Motley's apartment. *United States v. Conway*, 122 F.3d 841, 843 (9th Cir. 1997) (Wallace, J., con-

curring) ("Our precedent on the Fourth Amendment standards governing state probation searches is in considerable disarray.").[9]

It is useful to begin our analysis with the Supreme Court's 1987 decision in *Griffin*, where it held that a state may provide by law for searches of parolees and their property, including their homes, on less than probable cause. The Court upheld a Wisconsin regulation that subjected parolees to searches upon "reasonable grounds" to suspect the presence of contraband. *See* 483 U.S. at 872. In upholding that regulation, however, the Court did not specify the lower bounds of its holding. For instance, the Court did not decide whether a state law may provide for searches of parolees at any time, for any or no reason.

Since *Griffin*, the Supreme Court has twice addressed the constitutional limitations on parole-related searches, but neither case answers the precise question before us. In *Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357, 369 (1998), the Court held that parole boards are not required by federal law to exclude evidence obtained in violation of the Fourth Amendment. The Court expressly declined to rule on the question of whether a search of a parolee's residence must be based on reasonable suspicion where the parolee has consented to searches as a condition of parole. *Id.* at 362 n.3. Three years later, the Court picked up where it left off, holding that "*no more than* reasonable suspicion" of a probation violation is required to conduct a search of a probationer's residence. *United States v. Knights*, 534 U.S. 112, 121 (2001) (emphasis added) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal con-

---

[9]We have consistently recognized that there is no " 'constitutional difference between probation and parole for purposes of the fourth amendment.' " *Moreno v. Baca*, 400 F.3d 1152, 1168 n.12 (9th Cir. 2005) (quoting *Harper*, 928 F.2d at 896 n.1).

duct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."). The Court in *Knights* determined that the search at issue was supported by reasonable suspicion, but again expressly left open the precise question before us: Is a parolee's expectation of privacy so diminished that a search without any particularized suspicion is reasonable? *Id.* at 120 n.6. This alone strongly suggests that the issue was not clearly established in March 1999, nearly two years *before* the Court issued its opinion in *Knights. See United States v. Kincade*, 379 F.3d 813, 830 (9th Cir. 2004) (en banc) ("The only rational interpretation of *Knights*'s express reservation is that . . . it remains *entirely* an open question whether suspicionless searches of conditional releasees pass constitutional muster when such searches are conducted for law enforcement purposes."), *cert. denied*, 125 S. Ct. 1638 (2005).

Of course, the lack of a Supreme Court decision does not prevent a finding that a right is clearly established. Naturally, our decisions relating to the legality of searches of probationers and parolees are binding on law enforcement officers in this circuit. But our caselaw provides no clearer a picture of what was constitutionally required when the officers searched Motley's apartment. Before that search, some of our cases suggested that if officers conducted a parole search in accordance with state law, it would pass constitutional muster. *See United States v. Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir. 1992) ("A parole search is proper if conducted in a manner consistent with state law."). For example, in *United States v. Johnson*, 722 F.2d 525, 527 (9th Cir. 1983), we held that the validity of a state probation condition permitting searches "upon any reasonable request of a law enforcement officer" was governed by California law. *See id.* ("First, we look to whether the search condition itself was valid under California law. Second, we examine whether under the circumstances of this case the search condition was correctly applied."). While we required that there " 'be some conduct reasonably suggestive of criminal activity to "trigger" the search,' " we cited

California law for that rule. *Id.* at 527 (quoting *People v. Guerrero*, 149 Cal. Rptr. 555, 560 (Cal. Ct. App. 1978)). Indeed, in evaluating the reasonableness of the search in *Johnson*, our only reliance on federal law was our condemnation of the "practice of using one person's search condition as a pretext for conducting a general search unrelated to the acts of the probationer." *Id.* at 528.

Next, in *United States v. Wryn*, 952 F.2d 1122, 1124 (9th Cir. 1991), we held that "had the warrantless search of the probationer Wryn's home been authorized by either Montana state law or by Wryn's probation agreement we would consider the search 'reasonable' under the fourth amendment." *Wryn* involved a state law that required "reasonable cause as may be ascertained by a probation/parole officer" before conducting a search. *Id.* at 1124 n.1. We did not indicate in any way, however, that Montana's "reasonable cause" requirement ensured that its law authorizing probation searches did not itself violate the Fourth Amendment.

In *United States v. Watts*, 67 F.3d 790 (9th Cir. 1995), we again tied the constitutionality of probation searches to compliance with state law. We said that "[b]ecause a state's operation of its probation system presents 'special needs' beyond normal law enforcement which render impracticable the Fourth Amendment's usual warrant and probable cause requirements, probation searches conducted pursuant to state law satisfy the Fourth Amendment's reasonableness requirement." *Id.* at 793 (citing *Griffin*, 483 U.S. at 872-80). As in *Wryn*, the relevant state law at the time required reasonable suspicion of criminal activity before conducting a parole search, *see People v. Burgener*, 714 P.2d 1251, 1269-71 (Cal. 1986),[10] and that standard was satisfied. *See Watts*, 67 F.3d at 794 (officer conducting search "suspected that Watts . . . had returned to the business of selling drugs"). Thus, we had no

---

[10]*Burgener* was overruled by *People v. Reyes*, 968 P.2d 445, 449 (Cal. 1998), which is discussed *infra* at 16845-49.

occasion to decide whether a state law that did not require such suspicion violates the Fourth Amendment.

Two years later, we appeared to clarify what we meant when we previously referred to state law in the context of parole searches. In *Conway*, we said that "[a] probation search is permissible if conducted pursuant to a state law *that satisfies the Fourth Amendment's reasonableness standard*." 122 F.3d at 842 (emphasis added). We ultimately upheld the search in *Conway* because it satisfied a state statute authorizing parolee searches upon "reasonable cause to believe that an offender has violated a condition or requirement of the sentence." *Id*. (internal quotation marks omitted). If we achieved clarity in *Conway*, it did not last long.

In the same year we decided *Conway*, we embraced our earlier condemnation of using a parolee's search condition as a pretext for other law enforcement investigations and declared that "we have long recognized that the legality of a warrantless search depends upon a showing that the search was a true probation search and not an investigation search." *United States v. Ooley*, 116 F.3d 370, 372 (9th Cir. 1997) (search cannot be a "mere 'subterfuge' enabling the police to avoid having to obtain a search warrant"). Adding to the confusion, we said nothing of a reasonable suspicion of wrongdoing on the probationer's part. Although in *Knights* the Supreme Court ultimately rejected *Ooley*'s and *Johnson*'s focus on the underlying purpose of the search, *see United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002) ("*Knights* overturned a ruling of this court invalidating a search of a probationer on the ground that the search was not for probationary purposes, but was a mere subterfuge for a criminal investigation."), that occurred *after* the search at issue here, *see Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) ("Generally, courts do not look to post-incident cases to determine whether the law was clearly established at the time of the incident.").

**[10]** Against that backdrop, we simply cannot say that the contours of when officers could conduct parole-related searches was "sufficiently clear" so that appellees understood that their warrantless and suspicionless search of Motley's apartment violated her rights. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (phrasing test as, "[s]urveying the legal landscape as it existed in 1997 and 1998, were the contours of the right sufficiently clear that a reasonable official would understand that what he was doing violated that right?" (internal quotation marks and brackets omitted)).[11] Around six

(Text continued on page 16849)

---

[11]We acknowledge that, in the absence of binding precedent, we look to all available decisional law. *See Osolinski*, 92 F.3d at 936. While the other circuits have grappled with issues concerning parole-related searches, many of their rulings have no bearing on this case because they involve a state-imposed requirement of something like reasonable suspicion. *See, e.g.*, *United States v. Baker*, 221 F.3d 438, 449 (3d Cir. 2000); *United States v. Payne*, 181 F.3d 781, 786-87 (6th Cir. 1999); *United States v. Jones*, 152 F.3d 680, 687 (7th Cir. 1998); *United States v. Lewis*, 71 F.3d 358, 362 (10th Cir. 1995). Indeed, the only pre-March 1999 circuit cases that appear to address the issue before us — whether warrantless and suspicionless searches of parolees are constitutional — arrived at different conclusions. *Compare Owens v. Kelley*, 681 F.2d 1362, 1368 (11th Cir. 1982) ("It is clear that a requirement that searches only be conducted when officers have 'reasonable suspicion' or probable cause that . . . a condition of probation has been violated could completely undermine the purpose of the search condition."), *with United States v. Scott*, 678 F.2d 32, 34-35 (5th Cir. 1982) ("emerging and now rather stabilized concept" of reasonable suspicion governs parole searches). Two other circuit courts avoided the issue. *See United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997) ("leav[ing] . . . for another day" the question of whether California's law authorizing suspicionless parole searches is constitutional); *United States v. Giannetta*, 909 F.2d 571, 576 & n.2 (1st Cir. 1990) ("We express no opinion as to whether [search conditions without a reasonableness limitation] could routinely be imposed on all probationers.").

Nor does our survey of other pre-March 1999 caselaw compel the conclusion that the relevant law was clearly established. Two federal district courts sanctioned the warrantless and suspicionless search of a parolee, *see Rowe v. Carson*, 911 F. Supp. 389, 393-94 (D. Neb. 1996) (recognizing that the Nebraska Supreme Court upheld as constitutional search conditions " 'requiring the probationer to submit to warrantless searches, to

the extent that they contribute to the rehabilitation process and are done in a reasonable manner' " (quoting *State v. Morgan*, 295 N.W.2d 285, 289 (Neb. 1980))); *United States ex rel. Randazzo v. Follette*, 282 F. Supp. 10, 13 (S.D.N.Y. 1968) ("Any search by a parole officer in good faith to determine whether a paroled prisoner is complying with the conditions of his release would . . . be reasonable [unless] made too often or if made at an unreasonable hour or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the parole officer." (internal quotation marks and ellipsis omitted)), as did several state courts, *see, e.g.*, *State v. Zeta Chi Fraternity*, 696 A.2d 530, 540 (N.H. 1997) ("random warrantless searches of probationers not based on particularized suspicion of misconduct are constitutionally permissible" if search condition "is reasonably related to the supervision and rehabilitation of the probationer"); *State v. Perbix*, 331 N.W.2d 14, 21 (N.D. 1983) ("We . . . decline to impose a requirement that [parole] searches may be permitted only upon a showing of 'reasonable suspicion . . . .' "), *overruled by State v. Maurstad*, 647 N.W.2d 688 (N.D. 2002); *see also Hancock v. State*, 424 S.E.2d 77, 78 (Ga. Ct. App. 1992) (upholding search condition authorizing searches "any time of the day or night, with our without a search warrant whenever requested . . . by a probation supervisor").

Many states disagreed with that approach. *See, e.g.*, *People v. Eiland*, 576 N.E.2d 1185, 1191-92 (Ill. Ct. App. 1991) (probation searches must satisfy "reasonableness standard"); *Pena v. State*, 792 P.2d 1352, 1357-58 (Wyo. 1990) (parole searches require "reasonable suspicion"); *Commonwealth v. LaFrance*, 525 N.E.2d 379, 380 (Mass. 1988) ("We agree that . . . the Fourth Amendment . . . forbid[s] the search of a probationer or her premises unless the probation officer has at least a reasonable suspicion that a search might produce evidence of wrongdoing."); *State v. Velasquez*, 672 P.2d 1254, 1260 (Utah 1983) (parole searches require reasonable suspicion). In many cases, however, it is difficult if not impossible to discern whether the state court was interpreting state law as requiring reasonable suspicion or something similar. *See, e.g.*, *Eiland*, 576 N.E.2d at 1191 ("any probation condition imposed must be 'reasonable' under the language of section 5-6-3(b) [of Ill. Rev. Stat.]"); *Seim v. State*, 590 P.2d 1152, 1155 (Nev. 1979) (citing Colorado caselaw for requirement that officer "have reasonable grounds to believe that a violation of the parole or probation has occurred"); *see also Zeta Chi Fraternity*, 696 A.2d at 538-39 (discussing federal cases but noting that when "federal law is not more favorable to the defendant, we make no separate federal analysis" (citations omitted)); *LaFrance*, 525 N.E.2d at 380 (state constitution also requires reasonable suspicion before conducting probation search). To the

months before the search of Motley's apartment, California law changed dramatically and sanctioned a suspicionless search of a parolee's residence. *See People v. Reyes*, 968 P.2d 445, 451 (Cal. 1998) (overruling earlier decision and concluding that "particularized suspicion is *not* required in order to conduct a search based on a properly imposed search condition" (emphasis added)). Appellees reasonably could have believed that, under our prior caselaw, the constitutionality of the search condition in Jamerson's parole agreement — which did not require any suspicion of wrong-doing — depended in significant part on compliance with California law. Indeed, given our decisions in *Ooley* and *Johnson*, appellees reasonably could have viewed federal law as prohibiting only those searches that are done as a pretext for police investigations unrelated to the parolee. Although we now know that the latter belief was wrong in light of *Knights*, and the Supreme Court in *Samson* may tell us the former was too, that could not have been predicted in March 1999.

Motley cites two other cases to support her argument that we have "long required officers to have reasonable suspicion linking the parolee to some wrongdoing," but neither comes close to meeting the "clearly established" threshold. In *United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991), we noted that "[t]he permissible bounds of a probation search are governed by a reasonable suspicion standard." The question before us, though, was whether a safe inside the probationer's residence was a reasonable extension of the search condition in his probation agreement. We ultimately held that the "police must have reasonable suspicion, that an item to be searched is owned, controlled, or possessed by probationer, in order for the item to fall within the permissible bounds of a probation search." *Id.* Thus, viewed in its proper context, the *Davis* holding has little to do with our requiring a particular-

---

extent those courts were interpreting state law as imposing such a requirement, they shed no light on the issue before us.

ized suspicion of wrong-doing. It merely reflects our requirement — set forth earlier in this opinion — that officers have probable cause to believe that what they intend to search actually belongs, or is connected, to the parolee.

*United States v. Dally* is at best ambiguous on the issue. There we said that a parolee "may be searched, pursuant to a consent provision in his parole terms, if his parole officer reasonably believes a search is appropriate." 606 F.2d at 863. The parole agreement required Dally to obtain permission before changing residences and consent to searches "of his residence by his Parole Agent, any agent of the Department of Corrections, or any law enforcement officer." *Id*. at 862 (internal quotation marks omitted). We held that the parole officer's search was "authorized by California law" where the parolee failed to return calls and the officer learned that the parolee had another residence. *Id*. at 863. We did not, however, clarify whether we did so because the officer had a reasonable belief as to the parolee's new residence or because the parolee had violated the terms of his parole agreement by moving without permission.

Finally, we find it necessary to address *Moreno v. Baca*, No. 02-55627, 2005 U.S. App. LEXIS 26906 (9th Cir. Dec. 9, 2005) (as amended), decided earlier this year by a three-judge panel of our court. Moreno alleged that in January 2000, for essentially no reason whatsoever, while he was merely walking down the street, officers stopped, detained, and searched him. It was not until afterward that officers learned that Moreno was on parole. The officers sought to justify their actions retroactively on the ground that, as a parolee, Moreno was subject to search at will. Accordingly, the issue before the *Moreno* panel was whether officers must be aware of a parole condition before conducting a parole search. The panel's holding concludes that

> [b]ecause the Deputies did not know of Moreno's parole status . . . at the time they searched and seized

> him, th[is] circumstance[ ] cannot justify their con-
> duct. At the time of the incident in this case, it was
> clearly established that the facts upon which the rea-
> sonableness of a search or seizure depends, whether
> it be an outstanding arrest warrant, a parole condi-
> tion, or any other fact, must be known to the officer
> at the time the search or seizure is conducted.

*Id*. at *21-22 (citations omitted).

We agree with the *Moreno* court to the extent that it deter-
mined that the officers must be aware that the individual is on
parole before conducting a parole search. *See*, *e.g.*, *United
States v. Luckett*, 484 F.2d 89, 90-91 (9th Cir. 1973) (per
curiam). However, *Moreno* could be read as a declaration that
it has long been the law of this circuit that law enforcement
officers must have reasonable suspicion of wrongdoing to jus-
tify a parole search. Whether or not that reading goes beyond
the issue presented in *Moreno*, we reject it. We are squarely
confronted with the issue in this case and hold that it was not
clearly established at the time the officers searched Motley's
apartment.

**[11]** In summary, the officers are entitled to qualified
immunity for their search of Motley's apartment because,
first, they had probable cause to believe that parolee Jamerson
was living there; and second, it was not clearly established
that a particularized suspicion of wrong doing on Jamerson's
part was required as a prerequisite to the search of his resi-
dence. Accordingly, as respects the search, summary judg-
ment in favor of the officers was properly granted.

## III.   Section 1983 Excessive Force Claim

Motley alleges that during the search of her apartment,
Kading pointed a firearm at five-week-old Juan Jamerson,
who was lying on the bed in Motley's bedroom, and kept the
firearm trained on the infant while he searched the room. The

district court concluded that Kading was entitled to qualified immunity with respect to this claim. We reverse and remand.

### A.   Parameters of the Constitutional Right

[12] Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure[12] "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. The use of a force against a person who is helpless or has been subdued is constitutionally prohibited. *Robinson*, 278 F.3d at 1014-15 (holding that officers' use of firearms at close range, pointed at unarmed misdemeanor suspect's head, was excessive force); *see also Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-58 (9th Cir. 2003) (holding that officers' alleged act of prolonged pressure onto detainee's prone body as he lay on the ground handcuffed and gasping for air constituted excessive force), *cert. denied*, 542 U.S. 918 (2004); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (holding that repeated use of pepper spray against nonviolent protestors under police control rose to the level of excessive force).

[13] An officer's show of force is subject to Fourth Amendment reasonableness requirements even where no actual force is applied. *See Robinson*, 278 F.3d at 1014-15 (indicating agreement with the Fifth Circuit that " '[a] police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him.' " (quoting *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998) (per curiam))). The Seventh Circuit has also

---

[12]"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

reached this conclusion. In *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), the court held that

> It should have been obvious to [the officer] that his threat of deadly force — holding a gun to the head of a 9-year-old and threatening to pull the trigger — was objectively unreasonable given the alleged absence of any danger to [the officer] or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat.

*Id.* at 295.

**[14]** In this case, as in *McDonald*, none of the factors justifying the use of force toward Juan exists. While it may have been reasonable for Kading to have drawn his firearm during the initial sweep of a known gang member's house, his keeping the weapon trained on the infant, as he was alleged to have done, falls outside the Fourth Amendment's objective reasonableness standard. Motley has stated a constitutional violation.

## B.  Qualified Immunity

Having determined that Motley's factual allegations, if true, establish a constitutional violation, we turn our attention to evaluating whether the law was clearly established such that a reasonable officer would have known that the conduct was unlawful. To be clearly established for qualified immunity purposes, the contours of the asserted right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Camarillo v. McCarthy*, 998 F.2d 638, 640 (9th Cir. 1993) (internal quotation marks omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted); *McDonald*, 966 F.2d at 295 (recognizing that the qualified immunity defense will not succeed merely because the alleged behavior is so egregious that no previous case has found liability under those circumstances).

**[15]** Viewing the evidence in the light most favorable to Motley, the conduct engaged in by Officer Kading was objectively unreasonable given the absence of danger posed by Juan to Kading or any of the other officers at the scene. The use of any force was unwarranted under these circumstances. Any reasonable officer should have known that holding an infant at gunpoint constituted excessive force. "Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle [Officer Kading] to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1285 86 (9th Cir. 2001). We reverse the district court's grant of summary judgment in favor of Officer Kading on the excessive force claim and remand to the district court for further proceedings.

## IV.   *Monell* Claims

**[16]** We agree with the district court that Motley has not presented sufficient evidence to establish liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Accordingly, we affirm the dismissal of her claims against former LAPD police chiefs Parks and Gates.

### CONCLUSION

We affirm the district court's grant of summary judgment in favor of the officers as respects the search. We also affirm the district court's summary judgment in favor of the city officials as to the *Monell* claims. We reverse the court's grant of

qualified immunity to Officer Kading concerning the excessive force claim and remand for further proceedings.

**AFFIRMED in part; REVERSED in part. The parties shall bear their own costs on appeal.**

---

REINHARDT, Circuit Judge, with whom B. FLETCHER, PREGERSON and PAEZ, Circuit Judges, join, dissenting:[1]

I agree with the majority that because the Supreme Court has granted certiorari in a case that will likely resolve a question that we have consistently avoided — whether reasonable suspicion is required for the search of the home of a probationer or parolee who has executed a standard consent form as a condition of his probation or parole — we are justified in proceeding directly to the second prong of the *Saucier* test. I also agree for similar reasons that the pertinent law is not clearly established and, thus, that qualified immunity applies with respect to the search of a probationer's or parolee's residence without reasonable suspicion. I further agree that probable cause to believe that a probationer or parolee lives in a particular place is required in order to search that location. Thus, my disagreement with the majority opinion is narrow. I disagree only with respect to the holding that probable cause existed for the officers to believe that Jamerson lived in Motley's home. Contrary to the majority, I would hold that the officers did not have probable cause to believe that Jamerson currently resided there and would therefore reverse the district court's determination that Officers Ruegg, Kading, Sanchez, and Black were entitled to qualified immunity.

As the majority notes, the information regarding Jamer-

---

[1]Although I concur in Parts I, II.A, II.C, III and IV, I dissent with respect to Part II.B and the final paragraph of Part II, and therefore with respect to the Conclusion and the ultimate holding.

son's residence could have been collected at any point between November 1998, when the task force began gathering such information, and March 1999, when the LAPD briefing was conducted. Because Officer Ruegg assigned the task of gathering and confirming parolee information to another officer, he stated at his deposition that he had no way of knowing at what point during that period the information regarding Jamerson had been obtained. Also at his deposition, Ruegg acknowledged his awareness that "sometimes parolees didn't live where police thought they lived" and stated that he could not personally confirm the accuracy of any of the parolee data. Instead, Ruegg testified that it was the responsibility of the searching officers to verify such information before going to a parolee's residence. Given Ruegg's position and his knowledge that the information regarding Jamerson's residence could well be stale, it was not reasonable for him to fail to verify it through the use of any of several available methods. *See Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2002), *aff'd by Groh v. Ramirez*, 540 U.S. 551 (2004). As the supervisor of the search team, Ruegg is liable under § 1983 for the failure to verify and is not entitled to qualified immunity. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

Similarly, probable cause was lacking for the searching officers to believe that Jamerson was currently residing with Motley. At the March 18, 1999 LAPD briefing, the searching officers were provided with Jamerson's last known address and Jamerson's parole status, but they were not informed how current or stale that information was. When they arrived at Motley's residence, Motley told them that Jamerson did not currently reside there and that he was being held in custody. Instead of calling Jamerson's parole officer to ascertain whether it was true that Jamerson was currently in custody, or otherwise attempting to confirm such information, the officers lied, asserting falsely that Jamerson had been released, that Jamerson's parole officer was accompanying them on the search, and that they had a warrant to search the premises.

Even after the officers communicated those deliberate false-hoods to Motley, she emphatically repeated that Jamerson did not currently reside at her home and was being held in custody. At this point, the officers had a clear duty to confirm Jamerson's custody and residence status.

Although officers may reasonably "rely on information obtained from fellow law enforcement officers, . . . this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1293 n.16 (9th Cir. 1999) (citation omitted). Moreover, "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Groh*, 540 U.S. at 563. The searching officers in the instant case did not have a search warrant, but, as confirmed by their supervising officer, nevertheless had a duty to ensure that the information they possessed was correct. Of critical importance is the fact that the officers had not been advised by their supervisor how current or stale was the information regarding Jamerson's residence. Thus, Motley's repeated insistence that Jamerson was currently in custody, i.e. not currently in residence, was in no manner inconsistent with the specific information they possessed. Nevertheless, the officers made no attempt to verify Jamerson's current residence, even though they presumably could easily have done so by making a quick phone call to Jamerson's parole officer.[2] Furthermore, the officers' deliberate falsehoods strongly suggest that they did not have a reasonable belief that Jamerson was still a resident and that they sought to obviate the necessity for a further inquiry by gaining

---

[2]Justice Scalia recently asserted during oral argument in *Ayotte v. Planned Parenthood of Northern New England*, No. 04-1144 (S. Ct. argued Nov. 30, 2005), that it would take a doctor only thirty seconds to place a phone call to a judge to ask for the necessary permission to perform an abortion. One might assume that if it takes only thirty seconds for a doctor to reach a judge regarding an abortion, it would take even less time for a law enforcement officer to reach a parole officer in order to confirm an individual's custody status.

entry through threats and deceit. All in all, Officers Kading, Sanchez, and Black did not have probable cause to believe that Jamerson currently resided in Motley's home,[3] and, like Ruegg, are not entitled to qualified immunity.[4] Accordingly, I dissent.

---

[3]*Compare United States v. Harper*, 928 F.2d 894, 896-97 (9th Cir. 1991) (holding that the following facts about a parolee's residence "just barely" constituted probable cause to believe he resided there: the parolee had lived with his family immediately prior to incarceration, the parolee's family leased the house and several family members lived there, a source told the officers that the parolee lived there, the police saw the parolee enter the house with his own key several times, and several of the parolee's known associates had their cars parked outside the house).

[4]This analysis does not apply to Officer Webster, who was an officer in training at the time of the search and did not participate in the search of Motley's home.